## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Case No.  05-21207 |
| | § | |
| ASARCO LLC, *et al*. | § | Chapter 11 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

| | | |
|---|---|---|
| ASARCO LLC, | § | |
| | § | |
|    Plaintiff, | § | |
| v. | § | |
| | § | |
| AUGUSTA RESOURCE (ARIZONA) | § | |
| CORPORATION, AUGUSTA RESOURCE | § | |
| CORPORATION, ROSEMONT RANCH, LLC, | § | Adversary No. _____ |
| TWW INVESTMENTS, LLC, | § | |
| DAS HOLDINGS, LLC, HABIBI, LLC, | § | |
| WEST SANTA RITA LAND, LLC, | § | |
| LAZY Y I RANCH, LLC | § | |
| | § | |
| | § | |
|    Defendants. | § | |

### ASARCO LLC'S ORIGINAL COMPLAINT

Plaintiff ASARCO LLC ("ASARCO") respectfully files this Complaint (the "Complaint") and would show the Court the following:

### INTRODUCTION

1.      ASARCO seeks to avoid the June 2004 fraudulent transfer of certain of its property located in Pima County, Arizona (the "Rosemont Mining Property") to Rosemont Ranch, LLC.  According to Defendants Augusta Resource (Arizona) Corporation and Augusta Resource Corporation (collectively, the "Augusta Defendants"), the current owners of the property and subsequent transferees, the Rosemont Mining Property contains over 6 billion pounds of copper and has a net present value in excess of $400 million, assuming copper prices

similar to those at the time of the initial transfer to Defendant Rosemont Ranch in June 2004. However, cash starved and facing the threat of bankruptcy, ASARCO was forced to sell the property to Rosemont Ranch for a mere $4 million.

2.      Because ASARCO did not receive reasonably equivalent value in exchange for the Rosemont Mining Property at a time when ASARCO was insolvent and unable to pay its debts as they became due, the transfer to Rosemont Ranch should be avoided under 11 U.S.C. §§ 544 and 550 for the benefit of the estate and the Rosemont Mining Property recovered from the Augusta Defendants.

## JURISDICTION, VENUE, AND PROCEDURAL HISTORY

3.      On August 9, 2005 (the "Petition Date"), ASARCO filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in this Court. Prior to that date, on April 11, 2005, several of ASARCO's wholly owned direct or indirect subsidiaries (collectively "Subsidiary Debtors")[1] filed their voluntary petitions for relief under the Bankruptcy Code in this Court (collectively "Subsidiary Cases").  Since that time, several of ASARCO's other wholly-owned direct or indirect subsidiaries have filed similar petitions for relief in this Court (collectively with ASARCO and the Subsidiary Debtors, the "Debtors"[2]). Debtors' cases are collectively referenced in this Complaint as the "Reorganization Cases."

4.      The Debtors remain in possession of their property and are operating their businesses as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. On April 27, 2005, the United States Trustee appointed an official committee of unsecured creditors in the Subsidiary Cases.  The United States Trustee has also appointed an official

---

[1]     The Subsidiary Debtors are the following five entities: Lac d'Amiante du Québec Ltée (f/k/a Lake Asbestos of Quebec, Ltd.); Lake Asbestos of Quebec, Ltd.; LAQ Canada, Ltd.; CAPCO Pipe Company, Inc. (f/k/a/ Cement Asbestos Products Company); and Cement Asbestos Products Company.

[2]     The term Debtors does not include Encycle/Texas, Inc.

committee of unsecured creditors in ASARCO's case.  The Court has not appointed a trustee or examiner in any of the Reorganization Cases.

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

6.      The relief sought in this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

7.      Venue for this adversary proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1409.

## PARTIES

8.      Plaintiff ASARCO is a Delaware limited liability company and a debtor in these proceedings.

9.      Defendant Augusta Resource (Arizona) Corporation ("Augusta") is an Arizona corporation with its principal place of business in Vancouver, British Columbia.  Augusta's registered agent for service of process is CT Corporation System, 2394 E. Camelback Road, Phoenix, Arizona 85016.

10.      Defendant Augusta Resource Corporation ("Augusta Corporation") is a Canadian corporation with its principal place of business in Vancouver, British Columbia.  Augusta Corporation's registered agent for service of process is Gil Clausen, 1040-4500 Cherry Creek Drive South, Glendale, Colorado 80246.

11.      Defendant Rosemont Ranch, LLC ("Rosemont Ranch") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  Rosemont Ranch's statutory agent for service of process is Bradley P. Miller, 70 W. Cushing Street, Tucson, Arizona  85701.

12.    Defendant TWW Investments, LLC ("TWW Investments") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  TWW Investments' statutory agent for service of process is Bradley P. Miller, Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., One South Church Avenue, Suite #900, Tucson, Arizona 85701. It may also be served with process through its manager and member, Thomas W. Warne ("Warne"), 405 W. Franklin, Tucson, Arizona 85701.

13.    Defendant DAS Holdings, LLC ("DAS Holdings") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  DAS Holdings' statutory agent for service of process is Bradley P. Miller, Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., One South Church Avenue, Suite #900, Tucson, Arizona 85701.  It may also be served with process through its manager and member, Donald A. Somero ("Somero"), 405 W. Franklin, Tucson, Arizona 85701.

14.    Defendant Habibi, LLC ("Habibi") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  Habibi's statutory agent for service of process is Yoram Levy ("Levy"), 2200 E. River Road, Suite #115,  Tucson, Arizona 85718.

15.    Defendant West Santa Rita Land, LLC  ("West Santa Rita Land") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  West Santa Rita Land's statutory agent for service of process is Bradley P. Miller, 70 W. Cushing Street, Tucson, Arizona 85701.

16.    Defendant Lazy Y I Ranch, LLC ("Lazy Y I Ranch") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  Lazy Y I Ranch's statutory agent for service of process is Bradley P. Miller, 70 W. Cushing Street, Tucson,

Arizona 85701.   The parties described in paragraphs 9-16 of this Complaint are collectively referred to as the "Defendants".

## BACKGROUND FACTS

### A.     The Rosemont Mining Property.

17.     The Rosemont Mining Property contains over 6 billion pounds of known copper deposits, as well as significant deposits of molybdenum and silver.   The property consists of patented mining claims, unpatented mining claims, fee land and grazing leases and is surrounded by the Coronado National Forest approximately thirty miles southeast of Tucson, Arizona.   The Rosemont Mining Property is situated in a key location near ASARCO's Mission Mine.

18.     As a fully integrated copper miner, smelter and refiner, ASARCO obtained the Rosemont Mining Property for its own mining purposes through a series of acquisitions that took place in the 1980s and 1990s. In the 1990s, ASARCO began the mining permit process and working with the United States Department of Agriculture Forest Service towards a federal government land exchange. ASARCO and/or its predecessors also conducted over 232,000 feet of diamond drilling, outlining billions of pounds of copper deposits.   These copper deposits are significant and, according to the Augusta Defendants, "for 20+ years, Rosemont should produce 10% of US copper output, and supply about 6% of US copper consumption."

B.    __ASARCO's Manifest Insolvency.__

19.    Between 2000 and 2006, ASARCO experienced a sustained period of financial distress, was in desperate need of cash and hopelessly insolvent.   Following Grupo Mexico's leveraged buyout of ASARCO in 1999, ASARCO was undercapitalized and could not generate sufficient revenue to pay its debts when they became due.   Grupo Mexico directed the sale of ASARCO subsidiaries, such as American Limestone (a ready-mix/aggregate company) and Enthone-OMI (a specialty chemicals producer), to repay Grupo's acquisition debt.   Having businesses counter-cyclical to the metals industry, these subsidiaries diversified ASARCO, thereby protecting ASARCO from low copper prices.   Selling these subsidiaries left ASARCO exposed to copper price volatility, such that in periods of low copper prices ASARCO could not generate sufficient revenue from its operations to pay its debts when they became due.   The situation was critical in 2001 and 2002 and only got worse when Grupo Mexico directed ASARCO to sell ASARCO's controlling interest in Southern Peru Copper Company to ASARCO's direct parent company, Americas Mining Company, in 2003.

20.    Lacking capital, ASARCO was forced to sell assets as quickly as possible to raise cash to pay critical operating expenses.  Many debts simply were not paid because ASARCO did not have the money and had to marshal its limited cash to pay short-term operational costs. ASARCO's failure to meet is financial obligations resulted in several creditors placing liens on the Rosemont Mining Property.  ASARCO's severe financial distress continued through 2005 and became overwhelming when ASARCO's 1,500 union employees went on strike on July 2, 2005.

21.     ASARCO was unable to fund payroll on multiple occasions in 2003 and 2004. Because Grupo would not provide capital or allow ASARCO to seek financing, the company was forced to sell concentrates, anodes, and other work-in-process inventory at a discount to cover payroll and other short-term operational costs.    In selling assets to raise cash, management's mindset was survival.   Because of its desperate financial situation, ASARCO was forced to sell or otherwise monetize assets to generate cash without analyzing the assets' value to the company as an operating concern.

**C.     ASARCO's Transfer Of The Rosemont Mining Property For Less Than Reasonably Equivalent Value.**

22.     In January or February 2004, Yoram Levy made an unsolicited offer through his real estate broker, Leonard Reichardt, to purchase the Rosemont Mining Property for just $4 million, with closing to occur in 120 days.   By this time, ASARCO's lien creditors were demanding payment and threatening to take legal action, including forcing ASARCO into bankruptcy, if their claims were not paid.

23.     Believing that a quick sale to Levy could raise much needed cash to satisfy creditors' demands, ASARCO's management accepted Levy's fire sale price quickly and without making a counteroffer or engaging in any negotiations whatsoever.  ASARCO did not retain any professionals to market the property to other potential purchasers, and it did not explore other strategic opportunities with outside capital providers for further development of the property.

24.     On February 12, 2004, ASARCO and Rosemont Ranch, a company controlled by Levy, signed a Purchase and Sale Agreement (the "PSA"), and on June 11, 2004, ASARCO's representatives consummated the deal, transferring the Rosemont Mining Property and related personal property and cattle to Rosemont Ranch for approximately $4.2 million. After paying the lien creditors, ASARCO netted approximately $500,000.  According to the Augusta Defendants,

assuming June 2004 copper prices, the net present value of the Rosemont Mining Property exceeded $400 million—nearly 100 times the paltry price Rosemont Ranch paid for the property. But for the cash crisis and hopeless insolvency that ASARCO was experiencing at the time of the transfer, ASARCO never would have sold the property for such a tiny fraction of its true value.

25.    After purchasing the Rosemont Mining Property for what amounted to pennies on the dollar, Rosemont Ranch transferred partial, undivided interests in the property to its affiliates TWW Investments, DAS Holdings, Habibi, West Santa Rita Land, and Lazy Y I Ranch (collectively, the "Rosemont Ranch Affiliates" and with Rosemont Ranch, the "Rosemont Sellers").

26.     The Rosemont Ranch Affiliates did not acquire their interests in the Rosemont Mining Property as a result of an arm's-length, ordinary-course transaction. Rosemont Ranch's sole member is Triangle Ventures, LLC, whose members are Levy, Warne and Somero (collectively, the "Rosemont Members").   Each of the Rosemont Members is a direct or indirect member of one or more of the Rosemont Ranch Affiliates and, with the exception of Habibi, they all share the same domestic address.  On information and belief, the Rosemont Ranch Affiliates did not pay any value for their interests in the Rosemont Mining Property, and ASARCO's transfer of the Rosemont Mining Property was for the benefit of Rosemont Ranch and the Rosemont Ranch Affiliates.

27.    Further, on information and belief, Rosemont Ranch and the Rosemont Ranch Affiliates knew ASARCO did not receive reasonably equivalent value for the Rosemont Mining Property at a time when it was insolvent. Rosemont Ranch's below market purchase price was widely reported by the local media, as was the reason for the sale ― ASARCO  needed to raise cash quickly.  One Tucson newspaper quoted Rosemont Ranch's real estate broker, Leonard

Reichardt, as saying that the Rosemont Mining Property was worth more than $4 million and that "ASARCO unloaded it for less as a fire sale because the company needed cash."[3]

D.    **The Rosemont Sellers' Subsequent Transfer To The Augusta Defendants.**

28.    Presumably knowing that the Rosemont Mining Property was worth well more than the $4 million that Rosemont Ranch had paid ASARCO for it,  Rosemont Ranch and/or the Rosemont Ranch Affiliates began looking immediately to flip the property for a substantial profit. In January 2005, Arizona newspapers widely reported an offer by Levy on behalf of Rosemont Ranch and/or the Rosemont Ranch Affiliates to sell the property to Pima County, Arizona ("Pima County") for $11.5 million for conservation purposes, a price that did not take into account the fact that the property also contains one of the largest deposits (6 billion pounds) of quality grade copper in the United States.  On information and belief, Pima County declined the offer because the purchase was not part of a bond package approved by residents.

29.    At the same time that Rosemont Ranch and/or the Rosemont Ranch Affiliates were trying to sell the Rosemont Mining Property to Pima County, on information and belief, they were also negotiating a sale to the Augusta Defendants. Augusta and its parent, Augusta Corporation, are mineral exploration and development companies and, like ASARCO before its liquidity crisis, were interested in acquiring the Rosemont Mining Property for mining purposes. Within weeks after the closing of the sale to Rosemont Ranch, Augusta's founder and board chairman, Richard W. Warke—no doubt well aware of the tremendous value of the property's copper reserves—approached a key ASARCO employee with unique knowledge of the

---

[3]    Arizona Daily Star, January 9, 2005.

Rosemont Mining Property's mining potential and solicited him to assist Augusta in acquiring and developing the property. ASARCO's employee declined.

30.     On information and belief, Rosemont Ranch and/or the Rosemont Ranch Affiliates turned down an offer by Augusta and/or Augusta Corporation to buy the property for $12 million in 2004. Negotiations continued into the Spring of 2005. In April 2005, the Augusta Defendants, relying in part on ASARCO's own copper estimates, analyses and historical drilling program results, acquired an option (the "Option") to buy the Rosemont Mining Property for over $20 million, five times more than the price Rosemont Ranch had paid ASARCO for the property just ten months earlier—even though copper prices had risen only $0.25 per pound.[4]

31.     Presumably confident with the drilling results, analyses and copper estimates of ASARCO and/or its predecessors, by June 2, 2005, Augusta and/or Augusta Corporation made a non-refundable payment of more than $6 million towards their purchase of the Rosemont Mining Property.[5] Augusta and/or Augusta Resources then embarked on a "fast-track program" to "advance the development of the Rosemont copper project towards open-pit production," which included conducting a new drilling program and a pre-feasibility study.[6]

32.     Seven months *after* ASARCO's bankruptcy filing, Augusta and/or Augusta Corporation exercised the Option. In March 2006, the Rosemont Sellers, through the Rosemont Members, transferred the Rosemont Property to Augusta and/or Augusta Corporation for over $20 million (of which Augusta and/or Augusta Corporation had already paid approximately $6 million). By this time, copper prices had risen to over $2.00 per pound, a 25% increase from

---

[4]   Augusta Resource Corporation News Release dated June 2, 2005 (describing resource estimates by ASARCO and others).

[5]   Memorandum of Option dated April 25, 2005; Augusta Resource Corporation News Release dated June 2, 2005.

[6]   Augusta Resource Corporation News Releases dated July 12, 2005, November 10, 2005 and January 24, 2006.

April 2005 prices, making the Rosemont Mining Property even more valuable than when the Augusta Defendants had acquired the Option.

33.     At the time they negotiated the $20 million purchase price and later when they exercised the option and bought the Rosemont Mining Property, the Augusta Defendants  knew or should have known that the $4 million Rosemont Ranch paid ASARCO a few months earlier for the same property was not reasonably equivalent value. According to the Augusta Defendants' own press releases, the Rosemont Mining Property's net present value exceeded $400 million, assuming copper prices similar to those in June 2004, the date of the initial sale from ASARCO to Rosemont Ranch.   Further, before exercising the Option, Augusta and/or Augusta Corporation performed a significant amount of due diligence to verify the value of the Rosemont Mining Property.   According to their press releases, Augusta and/or Augusta Corporation spent more than a million dollars and hired at least four independent consultants to confirm ASARCO's drilling results.[7]  They also completed a 15-hole, 27,402 feet drill program.[8] Even before buying it, the president of Augusta Corporation publicly described Rosemont "as one of the best undeveloped open pit copper projects in the world and the only significant undeveloped one in the U.S."[9]

34.     Further, Augusta and/or Augusta Corporation knew or should have known of ASARCO's precarious financial condition at the time ASARCO sold the Rosemont Mining Property to Rosemont Ranch.  The copper industry is a small one and ASARCO's financial woes were well known, including the fact that the company had liquidated some of its most valuable

---

[7]     Augusta News Release dated July 12, 2005 (listing retained professionals); Augusta Management Discussion and Analysis Form 51-102F1 for period ending September 30, 2005 (disclosing project expenditures of $1,121,231).

[8]     Augusta Corporation Management Discussion and Analysis for the year ending December 31, 2005 at p. 3.

[9]     Augusta News Release dated January 2006.

ASARCO LLC'S ORIGINAL COMPLAINT

assets to raise capital. In its own public investor materials in 2006, Augusta acknowledged that "Grupo Mexico divested ASARCO US assets including Rosemont to generate cash."[10] And, by the time Augusta and/or Augusta Corporation exercised the Option, ASARCO had already been in bankruptcy for several months and struggling to survive a much-publicized labor strike of over 1,500 union employees.  One of Augusta Corporation's largest shareholders, Harbinger Capital, is also one of ASARCO's largest bondholder creditors.  The Augusta Defendants had actual knowledge of the avoidability of the sale to Rosemont Ranch or at the very least were certainly aware of facts that would have led a reasonable person to believe that ASARCO's transfer of the Rosemont Mining Property to Rosemont Ranch was avoidable, but chose to ignore them.

35.    At the time of the transfer, ASARCO was, as it is today, subject to the claims of numerous unsecured creditors, any one of whom could have avoided the transfer under applicable law.   ASARCO therefore has standing under section 544(b) of the Bankruptcy Code.

### COUNT I – FRAUDULENT TRANSFER
### 11 U.S.C. §§ 544(b)(1) and 550(a) AND ARIZ. REV. STAT. ANN. § 44-1004A.2

36.    ASARCO incorporates paragraphs 1 through 35 as though fully set forth herein.

37.    Prior to the Petition Date, ASARCO transferred the Rosemont Mining Property to or for the benefit of the Defendants.

38.    Said transfer was of an interest of ASARCO in property.

39.    Said transfer was made at a time when ASARCO (a) was engaged or was about to engage in a business or a transaction for which any property remaining with ASARCO was unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

---

[10]    Augusta Corporate Presentation dated November 2006.

ASARCO LLC'S ORIGINAL COMPLAINT

40.     ASARCO received less than reasonably equivalent value in exchange for making said transfer.

41.     As a result of said transfer, ASARCO and its creditors have been harmed.

42.     The Defendants are initial transferees of said transfer, entities for whose benefit said transfer was made, and/or immediate or mediate transferees of the initial transferee(s).

43.     Pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a), ASARCO is entitled to avoid the transfer and recover the Rosemont Mining Property or its value from the Defendants.

**COUNT II- FRAUDULENT TRANSFER**
**11 U.S.C. §§ 544(b)(1) and 550(a) AND ARIZ. REV. STAT. ANN. § 44-1005**

44.     ASARCO incorporates paragraphs 1 through 43 as though fully set forth herein.

45.     Prior to the Petition Date, ASARCO transferred the Rosemont Mining Property to or for the benefit of the Defendants.

46.     Said transfer was of an interest of ASARCO in property.

47.     Said transfer was made at a time when ASARCO was insolvent, or ASARCO became insolvent as a result of the transfer.

48.     ASARCO received less than reasonably equivalent value in exchange for making said transfer.

49.     As a result of said transfer, ASARCO and its creditors have been harmed.

50.     The Defendants are initial transferees of said transfer, entities for whose benefit said transfer was made, and/or immediate or mediate transferees of the initial transferee(s).

51.     Pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a), ASARCO is entitled to avoid the transfer and recover the Rosemont Mining Property or its value from the Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, ASARCO prays that the Court (a) enter judgment in its favor on all counts raised herein; (b) declare that ASARCO's transfer of the Rosemont Mining Property and all subsequent transfers of such property is/are void; (c) set aside and cancel the PSA, the deeds, bill of sale and any other documents evidencing the transfer of the Rosemont Mining Property from ASARCO to Rosemont Ranch and any subsequent transfers of such property; (d) return good and clear title to the Rosemont Mining Property to ASARCO for the benefit of the estate; (e) award ASARCO its attorneys' fees, prejudgment and post judgment interest, and costs to the fullest extent permitted by law; and (f) grant it such other relief as is just and equitable under the circumstances.

Dated:  August 7, 2007                    Respectfully submitted,

**BAKER BOTTS L.L.P.**

/s/ James R. Prince
Jack L. Kinzie
State Bar No. 11492130
James R. Prince
State Bar No. 00784791
J. Kemp Sawers
State Bar No. 00788358
John Nickelson
State Bar No. 24046534
Lesley C. Ardemagni
State Bar No. 24027341
Melissa Armstrong
State Bar No. 24050234
2001 Ross Avenue
Dallas, Texas 75201-2980
Telephone:      214.953.6500
Facsimile:      214.661.6503
Email:  *jack.kinzie@bakerbotts.com*
            *jim.prince@bakerbotts.com*
            *kemp.sawers@bakerbotts.com*
            *john.nickelson@bakerbotts.com*
            *lesley.ardemagni@bakerbotts.com*
            *melissa.armstrong@bakerbotts.com*


and

**JORDAN, HYDEN, WOMBLE & CULBRETH, P.C.**

Shelby A. Jordan
State Bar No. 11016700
Nathaniel Peter Holzer
State Bar No. 00793971
Suite 900, Bank of America
500 North Shoreline
Corpus Christi, Texas 78471
Telephone:      361.884.5678
Facsimile:      361.888.5555
Email: *sjordan@jhwclaw.com*
        *hwomble@jhwclaw.com*
        *pholzer@jhwclaw.com*

COUNSEL TO DEBTORS AND DEBTORS-IN-
POSSESSION